**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Sierra Club | ) |
| Michigan Chapter | ) |
| 109 East Grand River | ) |
| Lansing, MI 48906, | ) |
| | ) |
| Huron Mountain Club | ) |
| North 4700 County Road KK | ) |
| P. O. Box 70 | ) |
| Big Bay, MI 49808, | ) |
| | ) |
| and | ) |
| | ) |
| Marvin Roberson | ) |
| 227 Beckman Road | ) |
| Skandia, MI 49885, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| Dirk Kempthorne | ) |
| Secretary | ) |
| United States Department of Interior | ) |
| 1849 C Street, NW | ) |
| Washington, DC 20240, | ) |
| | ) |
| and | ) |
| | ) |
| H. Dale Hall | ) |
| Director | ) |
| Fish and Wildlife Service | ) |
| 1849 C Street, NW | ) |
| Washington, DC 20240, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1. This case, arising under the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 et seq., challenges the failure of the U.S. Fish and Wildlife Service ("FWS") to make a timely finding as to whether the Coaster Brook Trout (*Salvelinus fontinalis*) ("Coaster") population in the Salmon Trout River - the only population in the mainland United States, and one of just three remaining populations ("STR population") – warrants listing under the ESA as a threatened or endangered species. By failing to make such a finding within one year of receipt of plaintiffs' February 22, 2006 "Petition for the Listing of the Coaster Brook Trout as an Endangered Species" and May 23, 2006 supplement (collectively "Petition"), defendants have violated their mandatory duties under section four of the ESA, 16 U.S.C. § 1533, and defendants' own implementing regulations, 50 C.F.R. part 424.

## I.   JURISDICTION

2. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 16 U.S.C. § 1540(g).

## II.   PARTIES

### A.   Plaintiffs

3. The Sierra Club is a national nonprofit organization of over 1.3 million members and supporters, with over 19,400 members in Michigan. The Sierra Club's members are dedicated to exploring, enjoying, and protecting the wild places of the earth; to practicing and promoting the responsible use of the earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives. The Sierra Club and its members have been active in

protecting the rivers and streams feeding Lake Superior, and in protecting the flora and fauna in the region. In particular, they have been active in trying to protect the Coaster Brook Trout through, for example, the dissemination of information to members of the public and the government regarding the Coaster Brook Trout and the threats that the species faces, and through advocating for better protection of the species and its habitat.

4. The Huron Mountain Club is a membership organization and Michigan not-for-profit corporation incorporated in 1889 as a family retreat and wildlife preserve. The Club owns a significant portion of land in Northern Michigan through which the Salmon Trout River flows: the only river on the South Shore of Lake Superior known to be used by breeding Coasters. In historical times when Coasters were abundant, Club members enjoyed fishing for and admiring the unique beauty of these animals. Recognizing the decline of the spawning Coaster population, however, the Club has for many years refrained from fishing for them.

5. Pursuant to the Club's bylaws, the Club is committed to studying and protecting the area's forests and their wildlife for science and for the benefit and enjoyment of future generations. In this role, the Huron Mountain Club has been the primary conservator of the critically important Coaster Brook Trout habitat in the Salmon Trout River for over a century. In recent decades, during which the Salmon Trout River Coaster population has declined, the Huron Mountain Club, (and the Huron Mountain Wildlife Foundation, an independent Section 501 (c)(3) organization dedicated to biological research in the Huron Mountains) has worked to better understand and protect the Coaster, funding and encouraging research on the species and its habitat. The Huron Mountain Club has also taken steps to protect the surviving spawning population, including urging the State of Michigan to close fishing on the Salmon Trout River

during the season when spawning Coasters are in the river. The Club's various efforts to better understand the Coaster, and to restore its populations to abundance, have been motivated both by a desire to save a unique species from oblivion and also by the hope that the Club's members, and other Michigan residents, might one day again be able responsibly to enjoy the Coaster as an angling resource.

6. Members of Sierra Club and Huron Mountain Club enjoy canoeing, swimming in and/or fishing the streams and rivers along the southern shore of Lake Superior, including the Salmon Trout River. They enjoy the peaceful and bucolic nature of these areas and looking for and observing the wildlife - especially rare and/or threatened or endangered wildlife - and the excitement and challenge of catching fish. Of particular interest to the members is the Coaster Brook Trout, which resides in the Salmon Trout River. Not only is the Coaster Brook Trout of particular interest because it is biologically and ecologically unique, but it is also of particular interest because of its role in the history of the region as discussed below.

7. The interests of the Sierra Club's and the Huron Mountain Club's members in recreating in these areas, in looking for and observing the Coaster Brook Trout in its natural habitat, and the interests of Sierra Club and Huron Mountain Club and their members in obtaining, studying and disseminating information regarding the survival of the species, are harmed by the defendants' failure to take steps required by the ESA to make a determination whether to list the species under the ESA, because activities permitted in the absence of listing are contributing to the extinction of the species, and, absent listing, defendants will not take the steps necessary to ensure the species' recovery.

8. Marvin Roberson is a permanent resident of the Upper Peninsula of Michigan, a lifelong conservationist, an avid trout fisherman, and a regular visitor to the Salmon Trout River. He has hiked, canoed, kayaked, fished and swum in the rivers and streams feeding Lake Superior.  He does so because he enjoys the solitude, the scenery, and looking for and observing flora and fauna, including rare, threatened and/or endangered species such as the Coaster Brook Trout.  In this regard, he has worked to protect Coaster Brook Trout, and Coaster Brook Trout habitat.  Mr. Roberson's interests in enjoying Coaster habitat, observing and protecting the Coaster in its habitat, or one day fishing for the Coaster, have been injured by the defendants' failure to take steps required by the ESA to list the species under the ESA.

  **B.**  **Defendants**

9. Defendant Dirk Kempthorne is sued in his official capacity as Secretary of the United States Department of the Interior, as he has ultimate responsibility for the implementation of the ESA by the Department of the Interior.

10. Defendant H. Dale Hall is sued in his official capacity as Director of FWS ("Director"), the agency within the Department of the Interior that is responsible for implementing the ESA.

**III.** **STATUTORY FRAMEWORK AND FACTS GIVING RISE TO PLAINTIFFS' CLAIM FOR RELIEF**

  **A.**  **Statutory and Regulatory Framework**

11. Congress enacted the Endangered Species Act with the express purpose of providing both a "means whereby the ecosystems upon which endangered and threatened species depend may be conserved," and a "program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b).  The principal responsibilities for implementing the

ESA have been assigned to the Secretary of the Interior, id. at § 1532(15), who then delegated the responsibilities to FWS and the National Marine Fisheries Services ("NMFS").

12.  The ESA provides for the listing of species as "threatened" or "endangered" and ascribes protections to species that are so listed. The ESA defines a "species" as "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." Id. at § 1532(16). The ESA defines "endangered" as "in danger of extinction throughout all or a significant portion of its range or the territorial sea of the United States," id. at § 1532(6), and "threatened" as "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." Id. at § 1532(20).

13.  The FWS and NMFS (collectively "Services") have issued a "Distinct Population Segment" ("DPS") policy that provides guidance on what constitutes a DPS that warrants listing under the ESA. "Policy Regarding the Recognition of Distinct Vertebrate Population Segments Under the Endangered Species Act," 61 Fed. Reg. 4722 (Feb. 7, 1996) ("DPS Policy"). Pursuant to the DPS Policy, three considerations govern the listing of a population under the ESA: the population must be discrete, it must be significant, and it must warrant listing. Id. at 4725. A population is discrete if "[i]t is markedly separated from other populations of the same taxon as a consequence of physical, physiological, ecological, or behavioral factors;" or "[i]t is delimited by international governmental boundaries within which differences in control of exploitation, management of habitat, conservation status, or regulatory mechanisms exist that are significant in light of section 4(a)(1)(D) of the Act." Id. A population is significant if it persists in "an ecological setting unusual or unique for the taxon;" its "loss would result in significant gap in the

6

range of the taxon;" the population is the only remaining natural occurrence of the taxon; or if it "differs markedly from other populations of the species in its genetic characteristics." Id. A population that is both discrete and significant warrants listing under the ESA if it meets the definitions of "endangered" or "threatened" under the ESA. Id. See also 16 U.S.C. § 1532(6).

14. Under the ESA, a species must be listed as endangered or threatened if the FWS finds the species is a threatened or endangered species because of "any one or combination of the following factors":

> (A) present or threatened destruction, modification, or curtailment of [the species'] habitat or range;
>
> (B) overutilization for commercial, recreational, scientific, or educational purposes;
>
> (C) disease or predation;
>
> (D) the inadequacy of existing regulatory mechanisms; or
>
> (E) other natural or manmade factors affecting its continued existence.

16 U.S.C. § 1533(a)(1); See also 50 C.F.R. § 424.11(c). In making the determination whether to list a particular species, the FWS must make its finding "solely on the basis of the best scientific and commercial data available." Id. at § 1533(b)(1)(A); 50 C.F.R. § 424.11.

15. "To the maximum extent practicable," within 90 days of receiving a petition to list a species under the ESA the FWS shall make a finding as to whether "the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted." 16 U.S.C. § 1533(b)(3)(A); 50 C.F.R. § 424.14(b)(1). If the petition presents such information, the FWS must "commence a review of the status of the species concerned." 16

U.S.C. § 1533(b)(3)(A).  The FWS then has twelve months from the date the petition was received to conclude its review and determine whether the petitioned action is "warranted," "not warranted," or "warranted but precluded."  16 U.S.C. § 1533(b)(3)(B); 50 C.F.R. § 424.14(b)(3).  Any interested individual may petition the FWS, under the ESA, to list a species or a distinct population segment of a species as threatened or endangered under the ESA.  16 U.S.C. § 1533(b)(3)(A); 50 C.F.R. § 424.14(a).

16.  If the FWS makes a "warranted" finding it "shall promptly publish" in the Federal Register a proposed regulation to list the species, and shall also solicit public input.  16 U.S.C. § 1533(b)(3)(B)(ii), 1533(b)(5); 50 C.F.R. § 424.14(b).  Within one year after a proposed regulation is published, the FWS generally must conclude the rule-making process by either publishing a final rule protecting the species or withdrawing the rule.  16 U.S.C. § 1533(b)(6)(A).  Alternately, the agencies may make a "warranted but precluded" finding, but only if the petitioned action is precluded by other "pending proposals," "[e]xpeditious progress is being made" with regard to "qualified species," and the FWS' warranted but precluded finding and rationale are published in the Federal Register.  16 U.S.C. § 1533(b)(3)(B)(iii); 50 C.F.R. § 424.14(b)(3)(iii).

17.  Once a species is listed as endangered it is entitled to immediate protection under the ESA.  Among other things, the ESA makes it unlawful for any person to "take any . . . species within the United States" that is listed as endangered.  16 U.S.C. § 1538(a)(1)(B).  The term "take" includes "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  Id. at § 1532(19).  As permitted by 16 U.S.C. §

1533(d), these prohibitions have generally been extended to species listed as threatened under the ESA. See 50 C.F.R. § 17.31(a).

18. There are also other forms of protection accorded to species that have been listed under the ESA. For instance, Section 7 of the ESA obligates all federal agencies to consult with the Services on "any action authorized, funded, or carried out by such agency" to "insure" that the action "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species" which is "critical" habitat. 16 U.S.C. § 1536(a)(2). The listing of a species under the ESA also requires that the Services "develop and implement . . . recovery plans . . . for the conservation and survival of endangered species and threatened species:" plans that will bring the species back to the point at which it no longer needs the protections of the ESA. Id. at § 1533(f)(1).

19. Section 11 of the ESA provides the public a cause of action against the Service for violations of the ESA. 16 U.S.C. § 1540(g). Before a claim can be filed under section 11, the Service must be provided with 60 days notice, in which case suit may be brought immediately after notice is provided. Id.

### B.   Factual Background Giving Rise to Plaintiffs' Claim for Relief

#### 1.   The Coaster Brook Trout

20. The Coaster Brook Trout, *Salvelinus fontinalis*, is a genetically, physiologically, behaviorally, and geographically distinct sub-species of Brook Trout. Coasters are weakly anadromous, meaning that they migrate from streams, where they spawn, to Lake Superior, where they mature and spend the majority of their lives. More specifically, after rearing in small natal streams, Coasters migrate to the coastal areas of Lake Superior, where they stay until

returning as adults to the natal stream again to spawn. In contrast, most common brook trout spend their entire lifecycle in streams. Coasters are also larger than the common brook trout, they have genetic distinctions from the common brook trout, and research in the Salmon Trout River has shown that Coasters do not interbreed with the common brook trout.

21. Due to the migratory nature of the species, water quality in the coastal and fresh waters where the Coasters grow, mature and spawn is essential to the continued existence of the species. Coasters are highly sensitive to changes in water temperature, Ph, and flow rates. They are also sensitive to siltation of streams and rivers, in which case silt covers their spawning areas.

22. Today, Coasters are known to exist in only three remnant populations, in three areas in the Lake Superior Basin, two areas in the United States and one area in Canada: i) Isle Royale National Park and Wilderness Area, far out in Lake Superior; ii) the Salmon Trout River on the south shore of Lake Superior, and iii) in and around the Nipigon River system, along the northern shore of Lake Superior. None of these Coaster populations interbreed, or interact in any way.

    **2.  The Decline of the Coaster Brook Trout Population**

23. Before the 1800s, Coaster Brook Trout were found in at least 105 streams in the Lake Superior Basin and served as a major food source for indigenous peoples. Historical accounts describe Coasters being caught by the "boat load."

24. As discussed above, today they are known to exist in only three locations, and their numbers are greatly reduced. For example, the average annual spawning population of Salmon Trout River Coasters is less than 200 individuals. This dramatic decline is attributable to several

factors, including massive habitat modification and destruction, as well as historic overutilization. In addition, existing mechanisms used to regulate the Coaster and its habitat have been insufficient to protect this species.

25. One significant factor driving the Coasters' decline is the destruction of Coaster habitat, which in turn has been caused by a number of factors. Dams, for example, have adversely affected Coaster habitat as they can interfere with the Coasters' ability to travel from spawning and nursery habitats in streams and rivers to the shores of Lake Superior and back again. In addition, the construction of dams can lead to increased predation of migrating fish in head ponds, increased water temperatures, flooding of spawning habitat, and changes in water currents. The presence of hydropower dams can also severely impact fish mortality rates, by trapping fish in the turbines and killing or injuring them.

26. Modification and/or destruction of habitat can result and has resulted from changes in water quality in Coaster habitat. For example, acidic water is particularly toxic to post-emergent fry and pre-smolt trout, including the Coaster. It can also result in increased mortalities and interference with reproductive, respiration and gill performance functions. The tributary streams of the Great Lakes region lack adequate buffering of acid neutralizing capacity and therefore are highly sensitive to acidification. This drop in pH can occur as a result of acid rain, mining activity, and chemical spills.

27. Similarly, a number of forms of toxic pollution have also led to the modification and/or destruction of Coasters' habitat. Michigan waterways are high in organo-mercury compounds, which are often used in, for example, wood pulp processing. These compounds are highly toxic to both fish and humans. All inland lakes and most streams in the area carry fish

11

consumption advisory warnings due to excessively contamination found in local fish. In addition, since the Coasters inhabit coastal waters located near paper mills and other manufacturing plants, it is likely that deoxygenation has had some impact on the Coasters' ability to survive. Deoxygenation occurs as a result of bacterial breakdown of organic material, such as effluents from paper mills, breweries, fish-meal factories and domestic sewage. The resultant decrease in the amount of dissolved oxygen in the water can lead to the death of most plant and animal life in a given waterway.

28. Coaster habitat can also be degraded or destroyed as a result of increased silt and sediment. Among other things, silt, such as silt resulting from logging operations, can fill hollows used for juvenile Coaster protection, smother Coaster eggs, and decrease the amount of food available for young Coasters, and it might also reduce the visibility and light penetration in streams, affecting Coaster migration and feeding patterns. Excessive silt may also lead to Coaster mortality by collecting on gill membranes and interfering with respiratory systems.

29. Coasters' numbers are also dwindling in part due to historic overutilization in the form of commercial and sport fishing. Non-subsistence Coaster fishing began in the 19th Century and quickly had a radical impact on Coaster populations. By the 1940s, the Coaster population was reduced to its current depleted numbers, due in large part to excessive fishing. Today, fishing activities are restricted, though still allowed, and the precarious survival of the species means that any fishing that does occur could have a devastating impact.

30. Coasters are also adversely affected by the lack of effective government regulatory measures. For example, there is currently a patchwork of government regulations with often conflicting priorities that can impact, and can actually encourage the degradation of, Coasters

and Coaster habitat, such as permitting the continued fishing of the Coasters and the introduction of exotic species. Meanwhile adequate and effective enforcement of those protective regulatory mechanisms that do exist is lacking.

31. Coasters are also threatened by the introduction of exotic species, which can injure and/or compete with the native species, such as Coasters. For example, government agencies have introduced exotic salmonids into Coaster habitat.

32. The Salmon Trout Population of Coasters is under great threat at this time precisely because of such threats. Not only does it suffer from depressed numbers, but a nickel mine and processing facility has recently been proposed for location directly underneath the Salmon Trout River headwaters. This creates a distinct threat of subsidence and/or and acidification, among other concerns, with potentially devastating impact on the existing coaster population. Yet without listing of the STR population as a DPS, existing regulatory measures will not adequately protect the species. Upon information and belief, permits have already been issued by the Michigan Department of Environmental Quality for the mine.

### 3.    The Petition to List the Coaster Brook Trout Under the ESA

33. On February 22, 2006, plaintiffs submitted a petition to the FWS to list the Salmon Trout River population of the Coaster Brook Trout, which they supplemented on May 23, 2006. On April 27, 2006, the Service sent Petitioners a letter acknowledging its receipt of the February 26, 2006, petition, and indicating that the Service would not be making a determination with regard to the Coasters at that time because of a purported lack of funding. After the May supplementation, the Service agreed to review and consider the information in the Petition, including the May supplement.

34. The Service has failed to make a preliminary finding within the requisite ninety days of its receipt of the Petition as to whether the Petition presents substantial scientific or commercial information indicating that the Salmon Trout River population of the Coaster Brook Trout warrants listing under the ESA as a DPS.  <u>See</u> 18 U.S.C. § 1533(b)(3)(A).  The Service also failed to make the required determination within one year of receiving the Petition as to whether listing of the Salmon Trout River population as a DPS is "warranted," "not warranted," or "warranted but precluded" within one year of receiving the Petition.  16 U.S.C. § 1533(b)(3)(B); 50 C.F.R. § 424.14(b)(3).  The Service has previously indicated it would in fact be making a required determination shortly, though it has never made the determination.

35. Despite the urgency of the Coaster's condition, it has now been over 18 months since the Service received the May 2006 supplement, and yet the FWS has still not issued any findings.  This failure to respond in a timely manner violates the requirements of § 4 of the ESA.  <u>See</u> 16 U.S.C. § 1533(b)(3)(B).  Plaintiffs submitted a Notice of Violation of the Endangered Species Act on September 13, 2007, which the Service received on September 18, 2007.

## PLAINTIFFS' CLAIM FOR RELIEF

36. By failing to make a determination as to whether "the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted" within 90 days of receiving the Petition, the Service violated the ESA and its own implementing regulations.  16 U.S.C. § 1533(b)(3)(A); 50 C.F.R. § 424.14(b)(1).  Similarly, by failing to complete a twelve-month finding as to whether the Salmon Trout River population of the Coaster Brook Trout warrants listing under the ESA as an endangered or threatened distinct population segment, defendants have violated their mandatory statutory and regulatory duties

under the ESA and their own implementing regulations that require them to make a such finding. 16 U.S.C. § 1533(b); 50 C.F.R. § 424.14.  Thus, the Service has failed to perform non-discretionary acts or duties within the meaning of the ESA's citizen suit provision.  16 U.S.C. § 1540(g).

**WHEREFORE**, plaintiffs respectfully request that this Court:

1. declare that defendants have violated the Endangered Species Act;

2. order the FWS to complete a ninety day and a twelve-month finding regarding the listing of the Salmon Trout River population of the Coaster Brook Trout within 30 days;

3. award plaintiffs their costs and attorneys' fees; and

4. grant plaintiffs such other and further relief as this Court may deem just and proper.

Respectfully submitted,

　/s/　
Joshua R. Stebbins (D.C. Bar. No. 468542)

　/s/　
Howard M. Crystal (D.C. Bar No. 446189)

Meyer Glitzenstein & Crystal
1601 Connecticut Ave., N.W.
Suite 700
Washington, D.C.  20009
(202) 588-5206

Attorneys for Plaintiffs

Dated: December 17, 2007

JS-44
(Rev.1/05 DC)

## I (a) PLAINTIFFS

Sierra Club, Michigan Chapter,
109 East Grand River, Lansing, MI 48906,
Huron Mountain Club, North 4700 County Road KK, P. O. Box 70, Big Bay, MI 49808,
Marvin Roberson

## DEFENDANTS

Dirk Kempthorne, Secretary, United States Department of Interior, 1849 C Street, NW
Washington, DC 20240,
H. Dale Hall, Director, Fish and Wildlife Service, 1849 C Street, NW, Washington, DC 20240,

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  88888
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Joshua Stebbins
Howard Crystal
Meyer Glitzenstein & Crystal
1601 Connecticut Ave NW
Washington DC, 20009
202 588 5206

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

- ○ 1 U.S. Government Plaintiff
- ● 2 U.S. Government Defendant
- ○ 3 Federal Question (U.S. Government Not a Party)
- ○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

|   | PTF | DFT |   | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

### ○ A. Antitrust
- ☐ 410 Antitrust

### ○ B. Personal Injury/Malpractice
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Medical Malpractice
- ☐ 365 Product Liability
- ☐ 368 Asbestos Product Liability

### ● C. Administrative Agency Review
- ☐ 151 Medicare Act

Social Security:
- ☐ 861 HIA ((1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g)
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g)

Other Statutes
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☒ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

### ○ D. Temporary Restraining Order/Preliminary Injunction

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

## ○ E. General Civil (Other)   OR   ○ F. Pro Se General Civil

**Real Property**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent, Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**Personal Property**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**Bankruptcy**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

**Property Rights**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**Federal Tax Suits**
- ☐ 870 Taxes (US plaintiff or defendant
- ☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
- ☐ 610 Agriculture
- ☐ 620 Other Food &Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 RR & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**Other Statutes**
- ☐ 400 State Reapportionment
- ☐ 430 Banks & Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation

- ☐ 470 Racketeer Influenced & Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Satellite TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 900 Appeal of fee determination under equal access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ G. *Habeas Corpus/ 2255* | ○ H. *Employment Discrimination* | ○ I. *FOIA/PRIVACY ACT* | ○ J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ K. *Labor/ERISA (non-employment)* | ○ L. *Other Civil Rights (non-employment)* | ○ M. *Contract* | ○ N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**
- ⦿ 1 Original Proceeding
- ○ 2 Removed from State Court
- ○ 3 Remanded from Appellate Court
- ○ 4 Reinstated or Reopened
- ○ 5 Transferred from another district (specify)
- ○ 6 Multi district Litigation
- ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)
Violation of the Endangered Species Act, 16 USC 1533, for failure to make a listing determination.

**VII. REQUESTED IN COMPLAINT** ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   DEMAND $ 0   Check YES only if demanded in complaint
JURY DEMAND: YES ☐   NO ☒

**VIII. RELATED CASE(S) IF ANY** (See instruction) YES ☐   NO ☒   If yes, please complete related case form.

DATE December 17, 2007   SIGNATURE OF ATTORNEY OF RECORD _[signature]_

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I. COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III. CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV. CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI. CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.